IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

Kimberly Ann Reeves          :

    Plaintiff,          : Civil Action No. 3:16-CV-2510

    v.          : (Judge Richard P. Conaboy)

NANCY A. BERRYHILL,[1]          :
Acting Commissioner of
Social Security          :

    Defendant.          :

---

**Memorandum**

**I.   Background.**

    We consider here Plaintiff's appeal from an adverse decision of the Social Security Administration ("SSA" or "Agency") on her application for disability insurance benefits ("DIB"). Plaintiff appeals from a "final decision" of the Agency's Appeals Counsel dated October 31, 2016. (R.680-686. This Court has jurisdiction over this appeal pursuant to 42 U.S.C. Section 405(g).[2]

---

[1] Nancy A. Berryhill is now the Acting Commissioner of Social Security. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure which addresses the substitution of parties when a public officer is replaced, Nancy A. Berryhill should be substituted for Acting Commissioner Carolyn W. Colvin as the defendant in this suit. Fed. R. Civ. P. 25(d). No further action needs to be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. section 405(g), which states that "[a]ny action instituted in accordance with this subsection shall survive notwithstanding any change in the person occupying the office of Commissioner of Social Security or any vacancy in such office."

[2] We note that this Court had previously considered a final decision of the SSA in this matter and concluded that a remand was necessary for the SSA to give further consideration to several points raised in this Court's Memorandum and Order (Docs. 17 and 18 dated July 30, 2015; M.D. Pa. 3:15-CV-444). The current matter arises from the Agency's decision in the wake of that remand.

The Administrative Law Judge ("ALJ") who considered this claim found that Plaintiff had numerous "severe" impairments that include: fibromyalgia, carpal tunnel syndrome, obesity, migraine headaches, bipolar disorder, post-traumatic stress disorder (PTSD), anxiety disorder, and major depressive disorder/depression. (R.699).  Despite the presence of these multiple severe impairments, the AlJ concluded that Plaintiff had the residual functional capacity ("RFC") to perform sedentary work with various additional limitations.  (R.702).[3]  It is this RFC determination that is the focus of this appeal.  The issues have been fully briefed by the parties(Docs. 16, 17 and 18) and this case is now ripe for disposition.

## II. Testimony Before the ALJ.

### A. Hearing Conducted September 23, 2014.

Plaintiff's testimony before the ALJ on September 23, 2014 may be summarized as follows.  Plaintiff is a resident of Lock Haven, Pennsylvania and lives with her husband and three children aged 6, 14, and 15.  She stated that she was unable to work after her alleged onset date, September 28, 2012.  Plaintiff was two weeks short of her 43rd birthday on the date of the hearing.  She is right-handed, five feet two inches tall, and weighs approximately

---

[3] The ALJ's RFC determination in the previous phase of this case had limited Plaintiff to "light" work with the same additional limitations identified here.  These additional limitations will be discussed in more detail below.

190 pounds. She does have a driver's license but seldom drives. Her husband normally drives when they go anywhere. She occasionally drives to the grocery store (a distance of six miles) and to her doctor's office (a distance of 38 miles) accompanied by her husband. Her PTSD impairs her driving significantly because she has a fear of going under bridges and being in heavy traffic. She completed high school and has an associate's degree in criminal justice. She did military service from 1989 through 2004 and receives benefits from the Veterans Administration. (R.59-61).

She last worked in September of 2012 when she was employed by the GEO Group. She stopped working because an exacerbation of her illnesses was causing her to miss work too often. She quit because she was afraid she would be fired for missing so much time and she did not want a termination on her work record. She did work sporadically as a merchandiser setting up jewelry display in 2013. She worked only 5-6 days per month and lifted no more than ten pounds in the course of her employment as a merchandiser. Her last full-time employment for the GEO Group was as a corrections officer. This work was modified to accommodate her disabilities and her duties were flexible according to the way she felt on a given day. When she was feeling poorly she would be assigned to a control room where her job entailed pushing buttons to open and close doors in the facility. (R.62-63).

Plaintiff did look for other work after leaving the GEO Group

3

but her medications made her so nauseous and sleepy that she could not maintain full-time employment. At some unspecified time in 2012 her fibromyalgia intensified and her migraines became more frequent- - occurring up to five times weekly. She stated that as of her hearing date she was still experiencing one or two migraines each week. These migraines are of sufficient severity that she has to go to bed in a dark room with no noise when they occur. (R.63-64).

Plaintiff receives most of her medical treatment through the Veterans Administration. Her last hospital admission was in 2010 after she suffered a heart attack. Since then she has visited the emergency room several times for symptoms of PTSD and anxiety. At the time of the hearing, Plaintiff was taking the following medications: Tramodol, Imitrex, paraffin wax for carpal tunnel syndrome, Albuterol, Gemfibrozil, Ibuprofen 800 for fibromyalgia and inflammation, Loratadine for allergies, Omeprazole for gastric reflex, Duloxative for fibromyalgia, and Vitamin D. The combined effect of these medications produces sleepiness, nausea, and irritability (R.65-66).

In describing her daily activities Plaintiff stated that she rises at 6:30 a.m. to get her youngest child ready for the bus. She loads the dishwasher in the morning and then rests for a while. If she is having a good day she sometimes runs the vacuum or makes dinner in a crock pot. She generally watches from TV from 6:00 to

8:00 in the evening and reads with her son.  She uses a computer for approximately 15 minutes each day to check emails and monitor medical appointments.  Her use of the computer is limited because of symptoms of her carpal tunnel syndrome.  Also, prolonged viewing of the computer screen aggravates her photosensitivity and can bring on migraine headaches.  (R.66-67).

Plaintiff does some of the grocery shopping for her family but she tries to do this early in the day because she feels uncomfortable around large groups of people.  She belongs to the American Legion, The Veterans of Foreign Wars, and The Disabled American Veterans but does not attend any functions of those groups because she finds discussion of her military experiences in Iraq upsets her.  She has never smoked and has not gone to dinner and a movie in four years.  Her husband attends the various functions at her children's schools.  She generally does not go to these functions but did go to one parent/teacher conference with her daughter's kindergarten teacher.  (R.68-69).

She estimates that she can walk no more than 25 feet without her inhaler and testified to difficulty standing in place because of heel spurs and her fibromyalgia.  She estimated that she can stand for 15-30 minutes before needing to sit down to rest.  She also must change positions frequently when sitting because of scoliosis in her lumbar spine and joint stiffness.  She can lift items as heavy as a gallon of tea or a bag of sugar but must be

careful because she has a tendency to drop things due to paresthesia in her left hand.  She is treating for paresthesia with a rheumatologist.  (R.69-70).  Upon questioning by her attorney, Plaintiff told how she was accommodated while working for the GEO Group for five months in 2012.  She was required to walk around every 30 minutes but would be sitting 65% of the time observing inmates from the control booth.  Even with these accommodations she was unable to complete her shift on some days and she used up all her vacation and sick time within five months.  She stated that she missed three to five days each month in her time working for the GEO Group.  (R.70-72).

Plaintiff also discussed her tenure at a state hospital for the criminally insane where she worked from June of 2010 to January of 2011.  She was terminated from that job after missing two weeks of work due to vision problems.  This job had duties similar to the job she performed for the GEO group.  Prior to the job at the hospital for the criminally insane, Plaintiff worked as a desk clerk/housekeeping manager for a hotel.  She missed much time at this job as well and she quit after coming back from her heart attack due to interpersonal problems with her supervisor.  (R.72-74).

Plaintiff described numerous physical difficulties including: numbness and tingling in her left (dominant) hand; weakness in her right hand as a residual effect of a brain injury she suffered

while serving in Iraq; swelling in her feet with "fibro flares" that are typically worse in the morning and evening; difficulty walking due to paresthesia in her right knee; migraine headaches that occur one to two days each week and last four to twenty-four hours depending upon how quickly her prescription Imitrex works; and loss of sleep due to PTSD, anxiety, and panic attacks. (R.75-79).[4]

Plaintiff explained that she is rated by the Veterans Administration as 50% impaired due to PTSD and 40% due to fibromyalgia. These ratings in combination result in a VA determination that she is 100% disabled according to Veterans Administration criteria. Plaintiff continues to see a rheumatologist for her fibromyalgia and a psychiatrist for her PTSD and anxiety. (R.80-82)....

Also testifying was Patricia Chilleri, a vocational expert ("VE"). The VE testified that she had reviewed Plaintiff's employment history and that she was familiar with the Dictionary of Occupational Titles and the ratings it establishes for various jobs. The VE was asked to respond to a hypothetical question regarding an individual the same age as Plaintiff with a similar educational and work history who has the residual functional capacity ("RFC") to work at a light exertional level with

---

[4] Plaintiff related that while she was on duty in Iraq she was physically assaulted and injurred by an Iraqi national. The record indicates that she was in the military from 1989 through 2004. (R.78).

additional limitations including: only occasional balancing, stooping, crawling and kneeling; an inability to climb ladders or scaffolds; the need to avoid concentrated exposure to temperature extremes, moisture, fumes, dust, poor ventilation and excessive vibration or loud noises; the need to avoid moving machinery and unprotected heights; and a capability to perform only occupations that involve simple-routine tasks performed in a low stress environment involving only occasional interaction with co-workers and supervisors and no interaction with the general public.  When asked whether an individual who fit this profile would be able to perform any of Plaintiff's past military or civilian occupations, the VE stated that such a person could not perform any of Plaintiff's past relevant work.  (R.83-90).  The VE then stated that the hypothetical individual would be capable of performing jobs of the unskilled variety under the following occupational classifications:  "weighers, checkers, and measurers"; "administrative support workers"; and "production helper not elsewhere classified".  (R.83-91).

**B.    Hearing Conducted March 21, 2016.**

The hearing of March 21, 2016 focused on Plaintiff's physical and mental condition in the period after the previous hearing conducted September 23, 2014.  Much redundant information was obtained which will not be repeated here.

Plaintiff testified that in the interim period between her

hearings she had driven about four or five times each month.  She stated that her migraines have intensified and that she now suffers from them up to four days each week.  The Plaintiff's medicines have been changed in an effort to curb her migraines.  She also testified that she continues to suffer symptoms of fibromyalgia, has been diagnosed with spondylosis in addition to scoliosis, and that both her PTSD and anxiety disorder have gotten worse.  Her psychiatrist has prescribed different medications to help with her PTSD and anxiety problems (R.744-745).

Tramodol and Trazodene combined make Plaintiff sleepy.  They also make her sick to her stomach.  Her level of activity is somewhat less than that she had described at her previous hearing due to an exacerbation of her back problems.  Plaintiff's husband and children have taken over all household chores as of October or November of 2015.  The doctor who diagnosed her spondylosis prescribed a back brace for her and she was awaiting the scheduling of an MRI.  (R.746-748).

Plaintiff testified that about four months preceding her second hearing (in approximately November or December of 2015) she was taken to the emergency room during a particularly bad migraine.  The Veterans Administration doctor who attended her then prescribed a new medication to take in combination with the previously prescribed Imitrex.  Plaintiff also reiterated her need to frequently rotate from sitting to standing positions because of

9

pain in her back and numbness running down her right leg.  (R.748-750).

Upon questioning by her attorney, Plaintiff stated that for the four months preceding her hearing she had been experiencing two to four migraine headaches per week.  The Imitrex is sometimes helpful, but not always.  When she is experiencing a migraine she must lie down in a dark place.  On one occasion she was transported to the emergency room and was given "an IV migraine cocktail" for three hours because the Imitrex did not work.  Bright lights, noisy environments and certain smells can trigger her migraines.  She stated that she had missed four medical appointments in the last month due to the effects of her migraines and fibromyalgia.  Plaintiff also stated that in recent months her PTSD, panic attacks and depression had been less problematic due to new medications and therapy she had received.  (R.750-754).

Vocational Expert Patricia Chilleri once again summarized Plaintiff's past work history and reiterated her testimony in the previous hearing to the effect that, given the RFC proposed by the ALJ, the Plaintiff was incapable of performing any of her past relevant work.  (R.758-762).  Even when the RFC was changed to one describing sedentary work as opposed to light work with the same additional limitations previously noted, the VE continued to maintain that Plaintiff would be unable to perform her past relevant work of any kind.  As the VE had concluded at Plaintiff's

10

previous hearing in 2014, Ms. Chilleri stated that, even limited to sedentary occupations with the additional limitations imposed by the ALJ's RFC determination, Plaintiff could perform several jobs under the occupational classification of "sorters, handlers, testers, and inspectors". Upon cross-examination by Plaintiff's attorney, Ms. Chilleri did acknowledge that should Plaintiff be off task more than 20% of the workday or should she be incapable of working two days or more each month, she would be completely unemployable. (R.763-772).

**III. Impairment Evidence Re: Migraine Headaches.**

The following evidence charts the history of Plaintiff's migraine headache impairment. We include related evidence to provide context.

A November 4, 2009, Neurology Resident Note from the Hunter Holme McGuire VA Medical Center states that Plaintiff was seen for follow up because of headache for which she was seen in the emergency department on October 21, 2009. (R. 656.) Plaintiff was prescribed Topamax and Imitrex and she reported the Imitrex had a mild effect on her headache. (*Id.*) Because Plaintiff also complained of eye redness at the emergency department, she was sent to the eye clinic where some problems were noted and a lumbar puncture was offered which Plaintiff refused. (*Id.*) Plaintiff continued to report blurry vision at the November 4th visit. (*Id.*) It was noted that a lumbar puncture was necessary for a proper

diagnosis. (R. 658-59.) The pain assessment conducted at the time indicates that the headaches were accompanied by nausea and an inability to concentrate but did not affect Plaintiff's sleep, mood, or activities of daily living. (R. 559-60.) Plaintiff reported that the pain was sharp and unbearable, and she had the headache constantly for days. (*Id.*) Her pain was eight out of ten at the time. (R. 660.)

Plaintiff was scheduled to have a lumbar puncture on November 5, 2009, but did not show up for her appointment. (R. 648.) The procedure was rescheduled for November 9, 2009, but Plaintiff, who arrived at the appointment with her husband, was anxious and refused to continue with the procedure. (*Id.*) The procedure was rescheduled for November 12, 2009. (*Id.*)

A Primary Care Walk-in Patient Note of November 9, 2009, authored by Cynthia Kosuda, a licensed practical nurse, indicates that Plaintiff came in requesting a letter from her primary care provider "stating why she can't work." (R. 651.) The note also provides the following information: "She states that he has difficulty falling and staying asleep and is drowsy during the day, feels as though she has difficulty breathing at night, snores and suffers with headaches daily. She voices no complaint of pain at this time." (*Id.*) Ms. Kosuda discussed Plaintiff's request with Wayne Ham, M.D., and Dr. Ham did not write the note but ordered a sleep study. (R. 652.) Because Plaintiff was being seen by the

ENT and neurology clinics, Ms. Kosuda advised her to speak with the clinics about the requested note.  (*Id.*)

On November 17, 2009, VA CWT/SE Treatment Plan Note addresses Plaintiff's unemployed status and notes her strengths, abilities, job needs and preferences, vocational goals, and barriers to employment.  (R. 638-39.)  Medical difficulties were not noted to be barriers.  (R. 639.)

On November 24, 2009, Plaintiff again presented to the neurology clinic requesting medication for headache and stating the neurologist had told her there was other medication she could take but he did not order it.  (R. 621.)  Plaintiff rated her discomfort at three out of ten and reported daily headaches with blurred vision but denied nausea, vomiting, photophobia or phonophobia. (*Id.*)  Plaintiff was informed that the neurologist's previous note stated that a different medication would be considered depending on the results of the lumbar puncture.  (R. 622.)  A November 29, 2009, Addendum to the note by the attending neurologist stated that it was imperative to perform a lumbar puncture to properly diagnose Plaintiff and she would be given Lorazapam to help reduce her anxiety for the procedure.  (R. 622-23.)

A December 1, 2009, VA Progress Note indicates that Plaintiff presented with a chief complaint of migraine headaches.  (R. 600.) The following history was recorded:

38 u/o WF with pmh of exposure to two bomb blasts in 2003 and new onset headache 10/2009. She was seen in the ER 10/28/09 and found to have a swollen optic nerve, referred to opthamologist where she was dx with pseudotumor cerebi and referred to Neurology. Upon her visit to the Neurology clinic 11/4/09 a lumbar puncture procedure was attempted but the patient could not tolerate it. The plan was to administer Diamox depending on the opening pressure. She has been taking Topamax and Imitrex, Naproxen with very minimal relief it decreases from 7/10 ->3/10.

Today she presents to the Neurology clinic complaining of new onset dizziness, blackouts and blurry vision. She reports that she blacked out while sitting watching television lasting only a few minutes which was witness [sic] by her husband. Prior to the blackout, patient experienced dizziness and lightheadedness. She describes her headaches as being frontal and occipital with worse pain in the latter. She also has

> photophobia and phonophobia.  She also c/o
>
> decreased sensation in her right hand and leg
>
> since 11/04/09.

(R. 600.)  The Assessment was "pseudotumor cerebri and migraine headaches with little relief from meds."  (R. 603.)  Plaintiff was scheduled for another lumbar puncture and was to follow up in the Neurology clinic one week thereafter.  (*Id.*)

Plaintiff had the lumbar puncture on December 3, 2009.  (R. 589-94.)

On December 7, 2009, Plaintiff presented to the Emergency Department complaining of headache, nausea and dizziness since the December 3rd lumbar puncture.  (R. 586.)  Plaintiff was given morphine for pain and a neurology consult was ordered.  (*Id.*) Assessment included the observation that "[h]eadaches could be secondary to tension headaches vs migrane [sic] headaches vs tumor vs sinus venous thrombosis vs aneurysm (non leaking aneurysm). Post LP pressure headache may be contributing to pts headaches." (*Id.*)  The plan included further diagnostic studies and changes to her medical regimen.  (*Id.*)

Plaintiff was seen in the neurology resident clinic on December 15, 2009, for follow up.  (R. 566.)  Plaintiff reported that the neurologist she saw on December 7th "discontinued the topiramate and started her on amitriptyline to titrate to 100 mg at bedtime."  (*Id.*)  Plaintiff reported that she was taking 75 mg. and

15

was doing well and she got significant relief from Imitrex (R. 564, 566.)  She also reported that she continued to have daily headaches but they were not as intense and did not last as long.  (R. 566.) The plan was to titrate Elavil to 100 mg. and if the headaches were not sufficiently controlled with Elavil, to restart Topamax at a low dose.  (R. 565.)

A VA psychology note from December 30, 2009, indicates that Plaintiff reported that she did not feel her physical and mental health allowed her to work at the time.  (R. 549.)  The note provides the following background information:

> Upon returning from Iraq, Ms. Reeves returned to her home in Pennsylvania, but changed jobs - she had previously worked for 9 years doing insurance claims for Tri-Care while in the reserves but changed to work as a police officer at a school. . . . She worked for 2.5 years, but decided to leave and move to Virginia to help care for her mother when she became ill.  She said she has since regretted moving as she has not found work she enjoyed and has been "very stressed."  She added that she remains in pain every day, has been very depressed, and some symptoms of PTSD.  She reported she has

> attempted to work three jobs, most recently
> leaving her job working as a housekeeping
> manager for a hotel after being treated in a
> negative way by her manager at the hotel.
> She currently is remaining at home and caring
> for her three children ages 10, 9, and 2.
> She has a fourth child from a prior marriage
> who has recently joined the Marines.

(R. 548-49.)

At a January 14, 2010, kinesiotherapy initial assessment, Plaintiff's problem list included migraine headaches for which she was on medication. (R. 544.) It was noted that Plaintiff was unemployed and was going to school for her associates degree in criminal justice but was thinking of changing her major to respiratory therapy. (R. 545.)

A January 14, 2010, psychology note indicates Plaintiff reported feeling better since she got more medication for her headaches and her mood had improved. (R. 546.) Plaintiff also reported that she wanted to return to work and was hoping to return to school to develop skills as a respiration therapist or x-ray technician––she no longer wanted to work in law enforcement due to physical and mental stresses. (*Id.*)

On January 21, 2010, it was noted that Plaintiff's goal was

"to get back to normal," and she was seeing neurology for headaches and was working on medication management.  (R. 538.)

A January 27, 2010, recreational therapy note stated that Plaintiff appeared more motivated and felt her medication was helping.  (R. 522.)  She planned to enroll her children in a summer camp and volunteer at the camp herself.  (*Id.*)

A February 3, 2010, treatment note indicated Plaintiff continued to complain of headaches and was being followed by neurology.  (R. 516-18.)  Interdisciplinary treatment goals included the following: "Client will obtain suitable employment. GOAL NOT MET -- MODIFY AND CONTINUE -- Client will verbalize plan for future employment or education."  (R. 518.)  Plaintiff's "Current Vocational Status" was listed as unemployed: she had recently quit a job in the hotel industry and had several (5) interviews but was not working.  (R. 519.)

A February 9, 2010, psychology note states that Plaintiff's issues were focused on PTSD and she seemed more engaged in making life choices.  (R. 513.)  She said her husband told her she needed to work because she was less irritable when working and Plaintiff agreed with the assessment--noting that she had done "adequately" at her previous job until she had interpersonal issues with her boss.  (*Id.*) Additionally, Plaintiff reported that

> she is currently waiting on VA and social
> security claims to see if she qualifies and

> if she does she is hopeful she can afford
> daycare and return to college for her
> bachelor's degree to switch careers. She has
> continued to apply for some positions, but
> has not found anything yet. In the meantime,
> she is planning to fly to Portland, Oregon,
> to visit family and is hoping this respite
> from childcare will be helpful.

(*Id.*)

A sleep study was performed on March 20, 2010. (R. 480.) The Impression stated that the "recording does not suggest sleep disordered breathing . . . . Sleep is fragmented without indication of cause. (Medications, esp antidepressants, may contribute but other causes are certainly possible.)" (*Id.*)

As Defendant notes, from March 2010 until January 2013 there are no medical records concerning Plaintiff's physical treatment. (Doc. 15 at 6.)

On January 19, 2013, consultative examiner Kimberly Jones, D.O., noted that Plaintiff presented for evaluation of her chief complaints, i.e., depression, PTSD, fibromyalgia, migraine headaches, dextroscoliosis, plantar fasciitis, and carpal tunnel syndrome with PTSD and fibromyalgia noted as her biggest problems. (R. 280.) Regarding headaches, Dr. Jones noted they were believed

19

to come from the concussion she experienced while in Iraq. (R. 281.) Plaintiff reported that she gets two migraines per week of variable severity and she takes Imitrex for them. (*Id.*) Plaintiff added that she gets nausea and vomiting with the headaches, has passed out from them in the past and is unable to tolerate light when she has a headache. (*Id.*) Plaintiff was having a migraine at the time of her visit which Dr. Jones stated caused her moderate distress. (R. 283.) Dr. Jones recorded that Plaintiff stopped working as a correctional officer in September 2012 because of her claustrophobia, PTSD, and being unable to tolerate going up and down the stairs. (*Id.*) Plaintiff reported that she was doing all household chores but had difficulty with stairs and did not mow the grass. (R. 281-82.) Dr. Jones' Impressions included migraine headache. (R. 285.) Dr. Jones found no objective functional limitations but stated that Plaintiff had a blunted affect which appeared to correlate with her reported history of PTSD and depression. (*Id.*)

Plaintiff was seen on December 6, 2013, for primary care follow up by CRNP Kathryn Wilt. (R. 304.) Plaintiff reported that headaches occurred two or three times per week and she gets good relief with Imitrex. (R. 305.)

On June 16, 2014, Plaintiff was seen by Alfred Hardaway, M.D., for a consultative examination. (R. 334.) Plaintiff's chief complaints were similar to those expressed to Dr. Jones in January

20

2013.  (*See* R. 334.)  Plaintiff reported at least two headaches per week with no visual field defects.  (*Id.*)  Plaintiff continued to take Imitrex for the headaches.  (*Id.*)  Dr. Hardaway's diagnosis included migraine headaches.  (R. 337.)

Plaintiff saw Amit Mehta, M.D., a family practitioner at Geisinger Lock Haven in June and July of 2014, with the chief complaint of right knee pain.  (R. 356-63.)  On July 8, 2014, it was noted that Plaintiff also had complaints of lower backache and some stiffness/discomfort in her shoulders and rotation was tender. (R. 356.)  It was also noted that Plaintiff had a history of fibromyalgia.  (*Id.*)  Migraine headaches are not mentioned.  (*See* R. 356-63.)  At a subsequent examination on July 30, 2015 Dr. Mehta diagnosed Plaintiff with "intractable migraine with aura without status migrainous."  (R.2190-91).

**IV.  ALJ Decision.**

The AlJ's decision (Doc. 13-12 at 696-729) was unfavorable to the Plaintiff.  It included the following findings of facts and conclusions of law:

1.  The claimant meets the insured's status requirements of the Social Security Act through December 31, 2019.

2.  The claimant has not engaged in substantial gainful activity since September 28, 2012, the alleged onset date.

3.  The claimant has the following severe impairments:

21

fibromyalgia, carpal tunnel syndrome, obesity, migraine headaches, bipolar disorder, post-traumatic stress disorder (PTSD), anxiety disorder, and major depressive disorder/depression.

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1, 20 CFR 404.1520(b), 404.1525 and 404.1526.

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) except she can occasionally balance, stoop, crouch, crawl, kneel, and climb, but she can never climb on ladders, ropes and scaffolding. The claimant can frequently push and/or pull with the upper extremities and lower extremities. She can frequently perform gross and fine manipulation. The claimant must avoid concentrated exposure to temperature extremes of cold/heat, wetness, humidity, fumes, odors, dust, gases, poor ventilation, vibrations, and avoid moderate exposure to excessive loud noise such as traffic or jack hammering noise and hazards including moving machinery and unprotected heights. She can do simple, routine tasks,

but no complex tasks and she can work in a low stress environment defined as occasional-decision making and occasional changes in the work setting.  The claimant can have occasional interaction with co-workers and supervisors and no interaction with the public.

6.    The claimant is unable to perform any past relevant work.

7.    The claimant was born on September 9, 1971 and was 41 years old, which is defined as a younger individual age 18-44 on the alleged disability onset date.

8.    The claimant has at least a high school education and is able to communicate in English.

9.    Transferability of job skills is not material to the determination of disability because using the Medical Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills.

10.   Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the Plaintiff can perform.

11.   The claimant has not been under a disability, as defined in the Social Security Act, from September 28, 2012 through the date of this decision.

**V.    Disability Determination Process.**

The Commissioner is required to use a five-step analysis to determine whether a claimant is disabled.[5]  It is necessary for the Commissioner to ascertain: 1) whether the applicant is engaged in a substantial activity; 2) whether the applicant is severely impaired; 3) whether the impairment matches or is equal to the requirements of one of the listed impairments, whereby he qualifies for benefits without further inquiry; 4) whether the claimant can perform his past work; 5) whether the claimant's impairment together with his age, education, and past work experiences preclude him from doing any other sort of work.  20 CFR §§ 404.1520(b)-(g), 416.920(b)-(g); *see Sullivan v. Zebley*, 493 U.S. 521, 110 S. Ct. 885, 888-89 (1990).

The disability determination involves shifting burdens of proof.  The initial burden rests with the claimant to demonstrate that he or she is unable to engage in his or her past relevant work.  If the claimant satisfies this burden, then the Commissioner

---

[5]  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less that 12 months . . . ."  42 U.S.C. § 423(d)(1)(A).  The Act further provides that an individual is disabled

> only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 423(d)(2)(A).

must show that jobs exist in the national economy that a person with the claimant's abilities, age, education, and work experience can perform. *Mason v. Shalala*, 993 F.2d 1058, 1064 (3d Cir. 1993).

As set out above, the instant decision was decided at the fifth step of the process when the ALJ found there are jobs that exist in the national economy that Plaintiff is able to perform. (R.at 725).

## VI. Standard of Review

This Court's review of the Commissioner's final decision is limited to determining whether there is substantial evidence to support the Commissioner's decision. 42 U.S.C. § 405(g); *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999). Substantial evidence means "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *see also Cotter v. Harris*, 642 F.2d 700, 704 (3d Cir. 1981). The Third Circuit Court of Appeals further explained this standard in *Kent v. Schweiker*, 710 F.2d 110 (3d Cir. 1983).

> This oft-cited language is not . . . a
> talismanic or self-executing formula for
> adjudication; rather, our decisions make
> clear that determination of the existence *vel*
> *non* of substantial evidence is *not* merely a
> quantitative exercise. A single piece of

25

evidence will not satisfy the substantiality
test if the Secretary ignores, or fails to
resolve, a conflict created by countervailing
evidence.  Nor is evidence substantial if it
is overwhelmed by other evidence--
particularly certain types of evidence (e.g.,
that offered by treating physicians)--or if
it really constitutes not evidence but mere
conclusion.  *See Cotter*, 642 F.2d at 706
("Substantial evidence" can only be
considered as supporting evidence in
relationship to all the other evidence in the
record.") (footnote omitted).  The search for
substantial evidence is thus a qualitative
exercise without which our review of social
security disability cases ceases to be merely
deferential and becomes instead a sham.

710 F.2d at 114.

     This guidance makes clear it is necessary for the Secretary to
analyze all evidence.  If she has not done so and has not
sufficiently explained the weight given to all probative exhibits,
"to say that [the] decision is supported by substantial evidence
approaches an abdication of the court's duty to scrutinize the

record as a whole to determine whether the conclusions reached are rational." *Dobrowolsky v. Califano*, 606 F.2d 403, 406 (3d Cir. 1979). In *Cotter*, the Circuit Court clarified that the ALJ must not only state the evidence considered which supports the result but also indicate what evidence was rejected: "Since it is apparent that the ALJ cannot reject evidence for no reason or the wrong reason, an explanation from the ALJ of the reason why probative evidence has been rejected is required so that a reviewing court can determine whether the reasons for rejection were improper." *Cotter*, 642 F.2d at 706-07. However, the ALJ need not undertake an exhaustive discussion of all the evidence. *See*, *e.g.*, *Knepp v. Apfel*, 204 F.3d 78, 83 (3d Cir. 2000). "There is no requirement that the ALJ discuss in its opinion every tidbit of evidence included in the record." *Hur v. Barnhart*, 94 F. App'x 130, 133 (3d Cir. 2004). "[W]here [a reviewing court] can determine that there is substantial evidence supporting the Commissioner's decision, . . . the *Cotter* doctrine is not implicated." *Hernandez v. Commissioner of Social Security*, 89 Fed. Appx. 771, 774 (3d Cir. 2004) (not precedential).

A reviewing court may not set aside the Commissioner's final decision if it is supported by substantial evidence, even if the court would have reached different factual conclusions. *Hartranft*, 181 F.3d at 360 (*citing Monsour Medical Center v. Heckler*, 806 F.2d 1185, 1190-91 (3d Cir. 1986); 42 U.S.C. § 405(g) ("[t]he findings

of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . .").  "However, even if the Secretary's factual findings are supported by substantial evidence, [a court] may review whether the Secretary, in making his findings, applied the correct legal standards to the facts presented."  *Friedberg v. Schweiker*, 721 F.2d 445, 447 (3d Cir. 1983) (internal quotation omitted).  Where the ALJ's decision is explained in sufficient detail to allow meaningful judicial review and the decision is supported by substantial evidence, a claimed error may be deemed harmless.  *See*, *e.g.*, *Albury v. Commissioner of Social Security*, 116 F. App'x 328, 330 (3d Cir. 2004) (not precedential) (citing *Burnett v. Commissioner*, 220 F.3d 112 (3d Cir. 2000) ("[O]ur primary concern has always been the ability to conduct meaningful judicial review.").  An ALJ's decision can only be reviewed by a court based on the evidence that was before the ALJ at the time he or she made his or her decision. *Matthews v. Apfel*, 239 F.3d 589, 593 (3d Cir. 2001).

## VII. Discussion.

### A. General Considerations

At the outset of our review of whether the ALJ has met the substantial evidence standard regarding the matters at issue here, we note the Third Circuit has repeatedly emphasized the special nature of proceedings for disability benefits.  *See Dobrowolsky*, 606 F.2d at 406.  Social Security proceedings are not strictly

adversarial, but rather the Social Security Administration provides an applicant with assistance to prove his claim. *Id.* "These proceedings are extremely important to the claimants, who are in real need in most instances and who claim not charity but that which is rightfully due as provided for in Chapter 7, Subchapter II, of the Social Security Act." *Hess v. Secretary of Health, Education and Welfare*, 497 F. 2d 837, 840 (3d Cir. 1974). As such, the agency must take extra care in developing an administrative record and in explicitly weighing all evidence. *Dobrowolsky*, 606 F.2d at 406. Further, the court in *Dobrowolsky* noted "the cases demonstrate that, consistent with the legislative purpose, courts have mandated that leniency be shown in establishing the claimant's disability, and that the Secretary's responsibility to rebut it be strictly construed." *Id.*

## VIII.    Plaintiff's Allegations of Error.

Plaintiff alleges two errors that in her estimation should require that this matter once again be remanded for further consideration. We shall consider them in turn.

### 1.    Whether the ALJ Rejected Uncontradicted Vocational Evidence Supporting an Award of Benefits?

Plaintiff contends that a post-hearing submission from Paula Santagati, a Vocational Rehabilitation Counselor, should require remand of this case. Ms. Santagati opined that, given the ALJ's limitation of Plaintiff to "occasional interaction with co-workers

29

and supervisors", the Plaintiff would be unable to perform any of the jobs identified as within her RFC determination because each of these jobs requires a training period requiring more social interaction than the ALJ found she could tolerate. (Doc. 16 at 4). Plaintiff characterized Ms. Santagati's opinion as "uncontradicted". This characterization is not accurate.

Vocational Expert Patricia Chilleri testified at both hearings in Plaintiff's case. In each of these hearings she attested that she was familiar with the Dictionary of Occupational Titles, other manuals and treatises habitually relied upon by vocational counselors, and the jobs she discussed, both in terms of their descriptions and in the way the jobs are actually performed. From this reservoir of knowledge she was properly characterized as an expert by the AlJ and no objection to the contrary was made by Plaintiff's attorney at the hearings. Vocational expert Chilleri testified unequivocally that an individual with Plaintiff's residual functional capacity could perform the sedentary jobs she identified as limited by additional restrictions imposed by her RFC. For that reason, Plaintiff's characterization of Ms. Santagati's opinion as "uncontradicted" cannot be credited.

Still, Plaintiff's argument seeks to fault the ALJ for not providing an adequate explanation of why she preferred VE Chilleri's opinion to that of Ms. Santagati. Our review of the ALJ's decision persuades the Court that the ALJ's protracted

explanation for why she relied upon VE Chilleri's opinion (R.726-28) was more than adequate to support that reliance.  The ALJ noted Ms. Chilleri's educational background, her extensive professional experience including more than 30 years as a vocational expert appearing before the Social Security Administration, and her numerous certifications in vocational rehabilitation, disability management, and rehabilitation counseling.  The ALJ also noted that Ms. Chilleri's use of the Occubrowse program to buttress her opinion on the nature of the jobs the Plaintiff could perform, a use to which Plaintiff had specifically objected, was permissible because 20 CFR 404.1566 explicitly permits the Agency to "take the administrative notice of reliable job information available from various governmental and other publications."  The ALJ noted too that vocational experts generally cross-reference the Dictionary of Occupational Titles to other publications (such as Occubrowse) to arrive at estimates of the number of jobs available in a given catgegory.  Thus, the Court finds that the ALJ's rationale for accepting Ms. Chilleri's testimony regarding the number and type of jobs available within the AlJ's RFC determination for the Plaintiff was logical and sufficient.  Accordingly, Plaintiff's assignment of error on this point will be denied.

2.    **Whether the AlJ Properly Evaluated the Limiting Effect of Plaintiff's Migraine Headaches?**

In our previous Memorandum and Order (Docs. 17 & 18 dated July

30, 2015; M.D. Pa. 3:15-CV-444) concerning Plaintiff's application for DIB the Court found that, while the AlJ had acknowledged Plaintiff's migraine headaches to constitute a "severe impairment", her RFC determination did not provide for any limitations related to Plaintiff's migraines. The Court stated:

> Other than acknowledging Plaintiff's testimony in her
> review of the evidence, the ALJ does not discuss any
> evidence related to Plaintiff's headaches during the
> relevant time period nor does she provide a reason for
> not doing so. Thus, the ALJ does not provide a reason
> for discounting the limiting effects asserted by
> Plaintiff - -effects which if credited may preclude
> Plaintiff from competitive employment as per the VE's
> testimony.

(Docket item 17 at 30, M.D.Pa 3:15-CV-444).

The ALJ's decision of May 31, 2016 (Doc. 13-12) simply continues to manifest the deficiencies this Court had identified previously. The record in this case is redolent of the Plaintiff's lengthy history of severe migraine headaches. Plaintiff correctly notes in her brief (Doc. 16 at 11-12) that many progress notes by no fewer than eight medical providers document the chronic nature and intensity of these headaches. As the ALJ herself noted (R.714), one physician, Dr. Mehta, diagnosed Plaintiff with classical and intractable migraine headaches. Plaintiff has

testified consistently at two hearings that these headaches have occurred over a period of more than four years and that they have occurred at least once per week and as often as 3-4 times weekly throughout that time frame. She has also testified that when these headaches occur she becomes non-functional for anywhere from four to twenty-four hours. Linked as they are to a diagnosis that might be expected to produce the type and level of pain that Plaintiff alleges, Plaintiff's complaints of pain are entitled to great weight unless they are somehow undermined by contrary medical evidence. Ferguson v. Schweiker, 765 F.2d 31, 37 (3d. Cir. 1985). The ALJ points to no such contrary medical evidence anywhere in this record.

The ALJ's rationale for discounting the effects of Plaintiff's migraine headaches is, once again, inadequate. The ALJ notes, without citation to the record, that: "It seems when her medications wear off or when she has periods of significant stress related to family issues, she complained of headaches. She had significant pain relief with her medications and the records do not document her complaints of spending nearly every day in bed." This statement by the ALJ grossly mischaracterizes the records and Plaintiff's testimony. As noted earlier, her complaints of migraines were consistent over a period of more than four years and documented by several physicians. Also, she testified to spending 1-4 days each week incapacitated from four to twenty-four hours due

to migraines.  "Significant pain relif" as characterized by the ALJ is meaningless without context.[6]

The ALJ's only other reference to the effects of Plaintiff's migraines is her comment:

> Little weight is further given to the statement (by Dr.
> Magurno) that "marked scheduled disruptions due to
> migraines".  This opinion is not based on the claimant's
> objective examination but rather more so from subjective
> complaints.  The records show she has been treated for
> her migraines and as noted above fail to show that these
> are as debilitating on routine basis as alleged by the
> claimant at the hearings.  She was taking care of her
> neighbors' children in 2014, she watches television and
> reads.  The CT scans of the brain were unremarkable
> (Exhibits 9F and 17F) and the MRI was negative (Exhibit
> 11F, P. 276).  She had reported good relief with Imitrex
> in 2013, and had noted improvement with Inderal in 2015.
> There is no continual treatment with a neurologist for
> this conditon.

R. at 724).

This explanation has several components, each of them insubstantial.  First, at least three treating physicians, two

---

[6] The record indicates that Plaintiff has been taking Imitrex, later supplemented by Inderal, over a period of years to try, without success, to control her migraine headaches.

neurologists, and a consulting physician have documented the existence and persistent nature of Plaintiff's headaches. Second, there is no medical opinion in this record to substantiate the need for CT scans or MRI's to document migraine headaches.[7] Third, the fact that Plaintiff acknowledged watching a neighbor's children on a sporadic basis in 2014 and that she watches television and reads to some extent most days in no way refutes her assertions regarding the frequency and severity of her migraines. Fourth, the fact that she had good (but completely unquantified) relief with Imitrex in 2013 and noted improvement (again unquantified) with Inderal in 2015 does not contradict the severity or frequency of her symptoms. Fifth, there is no requirement that Plaintiff, who is treating with her family physican and has consulted with a neurologist for her migraines, be under the continual care of a neurologist.

What we are left with is a situation where the ALJ has accepted the fact that Plaintiff's migraines are a severe impairment". "Severe impairments" by definition cause significant limitation of a claimant's ability to work. See 20 CFR 404.1521(a). Yet, in this Court's estimation, the

---

[7] In fact, migraine headaches are normally diagnosed by resort to a patient's medical history, symptoms, and a physical and neurological examination. CT scans and MRI's are used only to rule out other causes for the symptoms a patient may be experiencing. www.mayoclinic.org/diseases-conditions/migraine-headache.

ALJ's RFC determination in this case includes no provision that reasonably relates to Plaintiff's symptoms from her well-documented chronic migraine headaches.[8]  Thus, this case must once again be remanded for the Agency to explain what evidence suggests that the Agency's RFC determination in this case gives adequate consideration to the limiting effects of Plaintiff's chronic migraine headaches.  In the alternative, the Agency may certainly elect to award DIB benefits inasmuch as there is certainly substantial evidence of record to support that result.  An Order to reflect the conclusions reached in this Memorandum will be issued contemporaneously.


BY THE COURT


                                   S/Richard P. Conaboy
                                   Honorable Richard P. Conaboy
                                   United States District Court


Dated: August 10, 2017

---

[8] It should be noted that Vocational Expert Chilleri, who was relied upon by the ALJ, has testified that if Plaintiff were to miss even two days each month due to the effects of her migraines she would be unable to maintain any employment.  (R.771-72).